# Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
## Motion to Reopen / Reconsider Final Order of Deportation

Melaia Ostling  INS # A27-106-119
York CI Inmate # 0294361
York CI
201 West Main Street
Niantic, CT  06357

BIA
Clerk's Office
5201 Leesburg Pike, Ste 1300
Falls Church, VA  22041

### RE: Request for Motion to Reopen / Reconsider Final Order of Deportation for Melaia L. Ostling – A27-106-119

## Introduction

NOW COME, Melaia L. Ostling before this court to present the following Motion for Reopening / Reconsidering the request that I submitted indicating my deportation would place *"exceptional and extremely unusual hardship"* on my family. I am providing this information based upon limited details that I have managed to gather and not upon requirements from the Immigration Judge (IJ) or the Bureau of Immigration Affairs (BIA) even though I have requested the requirements for writing this motion to meet this criteria. Several key items within the motion have not been completed and are in process. These are identified within the motion and will be submitted upon completion for review. This is one of the reasons why I requested additional time on my original brief.

The details within the motion support reasons for reopening/reconsider my final order of deportation and setting aside my order for deportation (or providing some other means of relief) and are presented within the following categories:

- Ostling / Tuineau Family
- Conditions in Tonga
- Community Ties
- Financial
- Educational
- Medical

Bureau of Immigration Affairs          Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

I understand that while I present the above for your review that other items must also be included within your review of the information presented.

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**
*While the majority articulates at least some of the various factors that must be considered, both Board and federal circuit court of appeals authorities require consideration of a greater breadth of factors, including the qualifying relative's family ties within and without the United States and the impact of separation; the economic and other conditions in the country to which she have to accompany her relative; the financial, emotional, cultural, and political conditions in that country; her ability to raise children and other quality of life factors in that country; as well as her age, length of residence in this country, health, technical skills, employability, and other factors. See, e.g., Mejia-Carrillo v. United States, 656 F.2d 520 (9th Cir. 1981) (relating to consideration of noneconomic hardships resulting from removal); Ravancho v. INS, 658 F.2d 169 (3d Cir. 1981) (relating to consideration of psychiatric information); see also Tukhowinich v. INS, 57 F.3d 869 (9th Cir. 1995) (relating to consideration of respondent's role as sole provider for her undocumented family here and abroad); Watkins v. INS, 63 F.3d 844 (9th Cir. 1995) (relating to consideration cumulatively of spouse's hardship, fear of persecution, child's inability to master a foreign language, and psychological factors); Salameda v. INS, 70 F.3d 447 (7th Cir. 1995) (relating to need to consider separation from community ties); Cerillo-Perez v. INS, 809 F.2d 1419 (9th Cir. 1987) (relating to consideration of hardship to other than qualifying family members). In addition, it must be noted that in a related context, the Ninth Circuit has been critical of this Board as being overzealous in grasping at any interpretation of law or facts which will allow it to defeat a bona fide claim for suspension of deportation. Castrejon-Garcia v. INS, 60 F.3d 1359, 1362 (9th Cir. 1995).*

Indeed I submit that the impact of this deportation on Mr. Ostling and my family would result in a loss "of all that makes life work living".

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 385**
*The Supreme Court has noted that "deportation may result in the loss 'of all that makes life worth living.'" Bridges v. Wixon, 326 U.S. 135, 147 (1945) (quoting Ng Fung Ho v. White, 259 U.S. 276, 284 (1922)). In this case, the respondent has developed such strong ties that deportation to Nicaragua would result in significant hardship on a social and psychological level. We find that deportation in this case*

Bureau of Immigration Affairs          Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

*would cause significant hardship over and above the normal*
*disruption of social and community ties involved in deportation.*

Throughout my presentation of materials I will be utilizing information from BIA Interim Decisions, and I understand that prior decisions carry merit during review of my information.

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 32-33**
*Moreover, other precedent decisions cannot be dismissed as eagerly as the majority may wish. Such decisions, which we not only followed historically, but which we issued directly, emphasize the often determinative weight given to family ties and, particularly, to marriage to a United States citizen.*

I have no knowledge if the decision took into consideration my activities and education among other items that were pursued while I was incarcerated. I have a partial record of my activities and these are included within Attachment L, other documentation was forwarded to Mr. Ostling whom is retrieving them for inclusion.

**Matter of Catalina ARREGUIN De Rodriguez (BIA 1995) Interim Decision 3247, pp. 3**
*Despite her current incarceration, the record reflects that the applicant has apparently used her time in prison well in that she has advanced her otherwise meager education by voluntarily pursuing GED studies, for which she received a letter of commendation, has pursued other courses, has had no prison infractions, and has been involved in a church ministry.*
*In sum, the applicant's acceptance of responsibility for her crime and her achievements while in prison are favorable indicators of efforts at rehabilita-tion which we take into account in weighing the equities of her application.*

## Ostling / Tuineau Family

I understand and present that historically family and community ties carry the greatest weight.

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 409**
*Historically, the Board has treated family and length of residence as being generally of the greatest importance in suspension cases. Except in rare cases, community ties are of markedly less importance, and for good reason. Church and recreational affiliations are routinely changed by persons as they move for any number of reasons, such as employment, schooling, marital and family choices, and health reasons.*

Bureau of Immigration Affairs       Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

Members of the Ostling Family members are:

1. Jonathan Christopher Ostling

2. Melaia Latu Ostling

3. Loleini Marie Ostling

4. Maika Ibrahim Ostling

5. Victor Garth Manu Ostling

*& ATTACHMENT M*

Details for each of the above family members follows (reference Attachment B pictures of the children):

**Jonathan Christopher Ostling**, born October 28, 1960 in Corvallis, Oregon. Graduated from Waldport High School in 1979. Graduated from Oregon Institute of Technology with an Associates Degree in Diesel Technology. Graduated from Oregon Institute of Technology with a Bachelors Degree in Automotive / Diesel Technology. The Chrysler Group of DaimlerChrysler (formally Chrysler Corporation) has employed him for almost 19 years. He has held a number of jobs with progressively increasing responsibility over his employment period. He has been within the Professional / Executive Management capacity for most of his employment. I also have included a letter from Mr. Ostling, (reference Attachment E, and includes work/business information). He doesn't speak Tongan or any other languages.

**Melaia Latu Ostling**, born May 06, 1964 in Tonga. Attended formal education in Tonga and came to the United States in 1982, married Jonathan Christopher Ostling in 1983. Is the mother of three US Citizen Children. I have lived in the US since coming here in 1982. I can fluently speak my native language of Tongan and have learned English as a second language. I possess no technical skills and during my residence within the US have been employed for approximately two months as a sales person in a department store. *( US Tenture Attachments A, M, & I)*

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**
*While the majority articulates at least some of the various factors that must be considered, both Board and federal circuit court of appeals authorities require consideration of a greater breadth of factors,. . . her ability to raise children and other quality of life factors in that country; as well as her age, length of residence in this country, technical skills, employability, and other factors. See, e.g., Mejia-Carrillo v. United States, 656 F.2d 520 (9th Cir. 1981) (relating to consideration of noneconomic hardships resulting from removal);*

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119

Motion to Reopen / Reconsider Final Order of Deportation

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp.385**

*When an alien has strongly embraced and deeply immersed himself in the social and cultural life of the United States, however, the emotional and psychological impact of readjustment must be considered in assessing hardship. Santana-Figueroa v. INS, 644 F.2d 1354, 1357 (9th Cir. 1981) (finding that extreme hardship could result from "the combined effect of depriving the petitioner of his livelihood and uprooting him from a community to which he had belonged and contributed for more than a decade.")*

**Loleini Marie Ostling**, born in Portland, Oregon on August 24, 1985, Social Security # 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. Is a US Citizen and has attended schooling in public and parochial private US Schools. She has participated in soccer, basketball, track, music and other various school activities. She holds a school track record, has won soccer division championships, and has been voted onto the district all-star Basketball team for the last two years. She sprained her ankle badly this past year in basketball and after therapy has reduced motion and mobility with the injury ankle. She does not speak Tongan and doesn't speak any other languages fluently. Loleini suffers from activity induced asthma and takes special medication at periodic intervals. Except for the $5.00 co-pay all of the cost of the medicine is covered by my health insurance. Local pricing for the medicines is; Albuterol USP Inhalation Aerosol for $24.00 at Rite Aid (lasts about 4-6 weeks) and E-Mycin 333mg $11.99 a week.

**Maika Ibrahim Ostling**, born in Troy, Michigan on April 23, 1993, Social Security # 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. Is a US Citizen and has only attended parochial private schooling. He has participated in soccer, baseball, basketball, and enjoys his RC car and playing outside. Maika has participated on division Basketball championship teams, and on very successful baseball teams. He looks forward to the time he plays his sports activities. This past year he dislocated and broke his right pointer finger while on school recess. He does not speak Tongan and doesn't speak any other languages. Maika suffered with pneumonia when he was younger and since has at times had difficulties with his breathing.

**Victor Garth Manu Ostling**, born in Troy, Michigan on April 24, 1996, Social Security # 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. Is a US Citizen and has only attended parochial private schooling. He has participated within soccer, baseball, basketball, and enjoys his RC car and playing outside. He enjoys all of his activities and is very good at basketball and baseball. He does not speak Tongan and doesn't speak any other languages. Victor suffers with breathing difficulties, it was suspected to be pneumonia, when he was younger and since has had difficulties at time with his breathing.

Bureau of Immigration Affairs         Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

As it relates to the children's upbringing within the US and the possible relocation to Tonga I present the following:

**23 I&N Dec. 45 (BIA 2001) Interim Decision 3446, Bing Chih KAO, Mei Tsui LIN, pp. 50**
*These children have lived their entire lives in the United States and are completely integrated into their American lifestyles. Their needs for housing, food, clothing, education, and community support have been adequately met. We are satisfied that to uproot the oldest daughter, Claire, at this stage in her education and her social development and to require her to survive in a Chinese-only environment would be a significant disruption that would constitute extreme hardship.5 Consequently, it is unnecessary to determine whether the other citizen children would also suffer extreme hardship.*

*Footnote 5 pp. 50 - Contrary to the characterization of our decision presented in the dissenting opinion of Board Member Jones, we assert nothing about the quality of the educational system in Taiwan. What we do find is that the children would be disadvantaged in Taiwan because they do not speak, read, or understand the language used in the only educational system that would be available to them.*

Indeed the Ostling family is firmly rooted within the US and has considerable ties to family, friends, classmates, fellow employees, and community.

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**
*Salameda v. INS, 70 F.3d 447 (7th Cir. 1995) (relating to need to consider separation from community ties); Cerillo-Perez v. INS, 809 F.2d 1419 (9th Cir. 1987) (relating to consideration of hardship to other than qualifying family members).*

Portions of the Ostling family has lived in the US for several hundred years (Attachment A, letter from Mrs. Gail Ostling, Jon Ostling's Mother, and also letter from Mr. Carl Ostling, Jon Ostling's Father) and an extensive family network exists that has over the past years has became tightly nit. I present that the extended Ostling family and the related impact on deportation should be seriously reviewed (Additional family letters are within Attachment A also). I also have included a letter from Mr. Ostling, (reference Attachment E). The courts have recognized the significance of impact upon the family:

Bureau of Immigration Affairs      Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 13, 14**

*However, the Supreme Court in INS v. Hector, supra, at 86 n.1, specifically recognized the relevance of such relatives' suffering to the determination of the hardship the respondent will suffer if deported, citing Contreras-Buenfil v. INS, 712 F.2d 401, 403 (9th Cir. 1983) (separation from woman and her son respondent lived with), and Antoine-Dorcelli v. INS, 703 F.2d 19, 21-22 (1st Cir. 1983) (separation from family for whom respondent was caretaker). Moreover, the United States Court of Appeals for the Ninth Circuit, where this case arises, has ruled that in considering the totality of factors relevant to the extreme hardship determination in suspension applications, the Board abused its discretion in failing to consider the consequences of an alien's deportation on other relatives not specifically listed under section 244(a)(1). See Tukhowinich v. INS, 64 F.3d 460 (9th Cir. 1995). The majority's statement that nonqualifying relatives need not be considered should be read only as applicable to applications for relief under section 212(i) of the Act, 8 U.S.C. § 1182(i) (Supp. II 1996), where hardship to the applicant is not a listed factor.*

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**

*Salameda v. INS, 70 F.3d 447 (7th Cir. 1995) (relating to need to consider separation from community ties); Cerillo-Perez v. INS, 809 F.2d 1419 (9th Cir. 1987) (relating to consideration of hardship to other than qualifying family members).*

I also understand that marriage and family relationships can override the adverse factor of a criminal conviction.

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 32-33**

*subsequent Board decisions found the fact of marriage and family relationships to override the adverse factor of a criminal conviction. See, e.g., Matter of Battista, 19 I&N Dec. 484 (BIA 1987) (emphasizing that an adjustment application filed by an alien whose immediate relative petition was approved prior to his entry as a nonimmigrant, and who had been convicted of grand theft, requires consideration of all factors, including his significant family ties).*

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 400**

*without regard to whether it is unique, circumstances of professional career interruption, poor nutrition and lesser education for children, and family separation. See, e.g., Matter of Iberra, 13 I&N Dec. 277 (R.C. 1968); Matter of Habib, 11 I&N Dec. 464 (D.D. 1965). It is not*

# Bureau of Immigration Affairs      Melaia Ostling – A27-106-119
## Motion to Reopen / Reconsider Final Order of Deportation

*unreasonable for us to give those precedent decisions some weight in the course of our independent interpretation*

### Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 14

*See, e.g., Matter of Gutierrez-Lopez, Interim Decision 3286 (BIA 1996). A respondent's relationship to his spouse's offspring may also be an appropriate consideration in the extreme hardship determination. See Contreras-Buenfil v. INS, supra. Any hardship to a qualifying spouse must always be considered. See Watkins v. INS, 63 F.3d 844 (9th Cir. 1995).*

Raising the Ostling children in Tonga is substantially different than that of the US there has been an extensive study regarding this compiled within the book "Becoming Tongan, An Ethnography of Childhood, by Helen Morton", ISBN 0-8248-1795-8. Helen Morton is a research fellow at La Trobe University in Melbourne. Her current research focuses on Tongan children and migration. Because of time constraints I am in process of compiling the numerous cited culturally unacceptable practices (in other industrialized countries and US) from this book, that the Ostling children would be exposed to in Tonga.

**Tuineau Family** (in Tonga)

I have four brothers Sione Tuineau, Manu Tuineau, Maika Tuineau, Loseili Tuineau, and Talaia Tuineau all of whom live in Tonga.

**Sione**, my elder brother, lives within the island group of Ha'api, has a simple job within the local medical clinic, and supplements his income with various crops he grows on his small garden (approximately 1-3 acres). He has three children all of whom are / or have attended public schooling, but because of the expense to send them to college none of the children have obtained any additional formal education. My brother currently takes care of my mother and my older sister.

**Manu**, an older brother, lives on a remote island in the Ha'api group with his family. He has two children and would be best referred to as a subsistence farmer. He makes a meager living from his small garden and from odds and ends that he performs for other people.

**Maika**, a younger brother, stays with Talaia on the main island of Tongatapu. He provides common labor doing odd jobs. He does not make enough money to sustain a family or a home for himself.

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

**Loseili**, a younger brother, lives on the main island of Tongatapu, and has a job on a boat. He just recently was married and is starting his own family. His wife does not work.

**Talaia**, my closest brother in age, lives on the main island Tongatapu, and has a clerical job within a small shipping and receiving company. He has seven children all of which are still at home and are attending public schooling. During different semesters my brother has been unable to pay the school fees and I have assisted.

None of my brothers are of substantial means and it would be impossible for them to provide enough means to support their families and our family in Tonga.

## Conditions in Tonga

The Kingdom of Tonga consists of 169 small islands scattered over a wide area of the South Pacific. Most of the approximately 105,000 inhabitants are Polynesian. Tonga is a constitutional monarchy in which political life is dominated by the King, the nobility, and a few prominent commoners (Map provided reference Attachment G). Coming from Tonga to the US is extremely unusual because of the small Tongan population and the vast larger number of immigrants from other countries. This is presented within the Immigration and Naturalization Services Statistics, reference Attachment H, which on Table 45 presents immigrants from Tonga as representing less than 0.05% of the total naturalized individuals for 1999. Also presented is Table 51 which identifies the major occupation groups for naturalized individuals notice that individuals from Tonga in all categories except one are less than 0.10%. Truly the representation of Tonga in any of the Table 45 & 51 INS statistics is unusual and exceptional. I understand unusual to encompass the following definitions;

From Random House College Dictionary-revised edition, copyright 1979, 1975 by Random House:

**un-u-su-al**, not usual common or ordinary, uncommon in amount or degree, rare, strange

**Matter of Monreal, 23 I&N Dec. 56 (BIA 2001), pp. 72**
*Not every child has a parent subject to removal who has lived here since his formative years. Not every child of a removable parent is approaching his or her teenage years. Not every child has grandparents who have immigrated here from their home country. Not every child would have to readjust to a society and a school system where classes are conducted in a different language.*

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

To provide you with an overview of Tonga I am providing three items that I will use, as follows:

- **Tonga - Country Reports on Human Rights Practices, 2000**. This is from the US Department of State (Attachment C). Documents of this nature have been determined creditable in prior BIA decisions.

  **23 I&N Dec. 45 (BIA 2001) Interim Decision 3446, pp. 53 footnote, pp. 54**
  Page 53 Footnote 1.These figures are taken from the Statistical Analysis Report, which is located at the online website for the National Center for Education Statistics at <www.nces.ed.gov/pubs2001/2001028.pdf>. Given that this study was compiled under the auspices of the United States Department of Education, I find that it holds a significant amount of weight and credibility.

  Page 54 – References the US Department of State's Country Reports on Human Rights Practices for 2000, available in http://www.state.gov/g/drl/rls/hrrp/2000/eap.

I see no reason why this source would not also be considered as that contained within the footnote on page 53 since it also is produced by the US Government "I find that it holds a significant amount of weight and credibility."

From the US Department of State's Country Reports on Human Rights Practices for 2000 I bring forth the following (Attachment C):

1. **Economy** - (Attachment C) pp. 1 *"The economy is based primarily on the cultivation of tropical and semitropical crops. Demand for imported goods and products has led to a substantial trade deficit. This deficit has been offset largely by remittances from Tongans employed abroad, overseas aid, and, to a lesser degree, tourism." Pp. 5 "Industrial accidents are rare, since few industries exist that would expose workers to significant danger. Due to these factors, little or no work has been done on industrial safety standards."*

   There are no businesses similar to that which Mr. Ostling has been employed within during his professional career over the past several years (reference Attachment E). Indeed he most likely would have to revert to some form of manual labor to make a subsistence type of income. The majorities of goods in Tonga are imported from abroad and have a substantial government import tariff placed on them. A large number of Tongans can only afford

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

imported goods either because they are the privileged few within society or
because they have family abroad that provides income to them. Our family
customarily provides monies to family members' back home on special occasions
and if we had to move this would cease. This is a total withdrawal from
everything that the Ostling Family is accustomed to. Electricity, water,
automotive gas, and propane are not readily available items since Tonga has
literally none of these natural resources (except water, this is even severely
limited) and the price is extremely expensive. I am in process of compiling a cost
of living comparison for standard goods in Tonga to the US and this will be
submitted for inclusion upon completion.

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 385**
*While economic detriment alone is not enough to constitute*
*extreme hard-ship, it "is still a factor to consider in determining*
*eligibility for suspension of deportation." Mejia-Carrillo v. United*
*States INS, 656 F.2d 520, 522 (9th Cir. 1981).*

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 400**
*without regard to whether it is unique, circumstances of professional career*
*interruption, poor nutrition and lesser education for children, and family*
*separation. See, e.g., Matter of Iberra, 13 I&N Dec. 277 (R.C. 1968); Matter of*
*Habib, 11 I&N Dec. 464 (D.D. 1965). It is not unreasonable for us to give those*
*precedent decisions some weight in the course of our independent interpretation*

**TV and Radio Programming.** There are two TV stations broadcast old
reruns from the US and other countries along with local programming. There is
approximately five AM/FM Radio stations, these broadcast predominately in the
Tongan language. Very little if any programming is provided that contains current
events within the US (current available radio or TV programming). In this way
the Ostling Family would be totally disconnected with the US and I believe it
would pose a dramatic impact upon the children.

2. **Human Rights** – (Attachment C) pp. 1 *"The Government's human rights record*
   *was generally poor in several areas, and the principal human rights abuse*
   *remains severe restrictions on the right of citizens to change their government. . .*
   *At times the authorities infringed on freedom of speech and of the press." Pp. 3*

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

*"Citizens do not have the ability to change their leaders or the system of government. The King and 33 hereditary nobles dominate political life."*

The civil rights that Mr. Ostling and the children have within the US would be taken away. The fundamental right & ability to elect the government and participate within this process is all gone. I present that this would bring raise Maika and Victor with the incorrect perspective of government as it relates to their citizenship and would impact their ability to reintegrate into US society. This also deprives our daughter Loleini to use her rights as she was taught in school. "Go and vote for whom and what you believe in". This is a country for the people and by the people. . .

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**
*Watkins v. INS, 63 F.3d 844 (9th Cir. 1995) (relating to consideration cumulatively of spouse's hardship, fear of persecution, child's inability to master a foreign language, and psychological factors*

3.  **Women's Rights / Discrimination** – (Attachment C) pp. *1 "Some women suffer from domestic violence, and discrimination limits the opportunities available to women." Pp 3 "Women are severely underrepresented in government and politics. There are no female Members of Parliament, although there have been in the past." Pp 3 bottom "Domestic violence seldom is publicized, but it is a problem. . . Such abuse is seldom reported to the police. . . . The country is male dominated, and women generally occupy a subordinate role. For a women to rise to a position of leadership, she usually needs to have the support of the nobility or to possess exceptional talent. "*

The US has been striving for years to provide better equality for women in the workplace and to resolve the number of issues such as; schooling, spousal abuse, equal opportunity, etc. that place limitations upon a woman's potential to excel. Indeed this is an extreme step backward for our daughter Loleini, and a dramatic change for myself since I have become accustomed to the provisions for women within the US. She would be forced back about +100 years in US history to live a lifestyle that is unacceptable for US women citizens today. Her

Page 12 of 29

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

opportunities within business and government are non-existent since my family is not of royal or noble class and she is not a Tongan and doesn't speak Tongan. Because she was not raised in Tonga she would be out of place and gossiped about because of her inability to follow traditional customary requirements.

This also causes extreme concern for me over my two boys, Maika and Victor. They would be growing up in an environment where the roles of male and female are not one of equality but are of male dominance. This poses significant conflicts when they would come back to the US. It could indeed put them at a significant disadvantage in many respects to employment, attitude, lifestyle, and permissible behaviors. They would be different and would be picked on at school, ridiculed, stones thrown at, beat up, and a large number of other things because they cannot speak Tongan and are different.

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**
*Watkins v. INS, 63 F.3d 844 (9th Cir. 1995) (relating to consideration cumulatively of spouse's hardship, fear of persecution, child's inability to master a foreign language, and psychological factors*

4. **Education –** (Attachment C) pp. 4 *"Education has been compulsory since 1882. Although it is sometimes criticized as being of poor quality, education is provided for all children through Form 6 (high school). Compliance rates are good."* Additional supporting information regarding the educational system can be found under the Education section.

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 400**
*without regard to whether it is unique, circumstances of professional career interruption, poor nutrition and lesser education for children, and family separation. See, e.g., Matter of Iberra, 13 I&N Dec. 277 (R.C. 1968); Matter of Habib, 11 I&N Dec. 464 (D.D. 1965). It is not unreasonable for us to give those precedent decisions some weight in the course of our independent interpretation*

5. **National/Racial/Ethic Minorities –** (Attachment C) pp. 1 *"There were some incidents of racial violence." Pp 4 "In June a member of the royal family*

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

*commented publicly on what he called the country's "racially based land laws,"*
*and stated that a previous spate of violence against Chinese-owned shops was*
*racially motivated. Late in the year, a local official announced that Chinese-*
*owned stores were banned from his district on the western side of the country."*

This identifies the following issues for our family;

- Successful stores (businesses) established by non-Tongans suffer hardship from the local community.

- Government limits the ability of non-Tongans to be successful.

- This racial violence example is related to Chinese immigrants however is not limited to them but was created because of their success over local establishments.

- Limits non-Tongan business and revenue capabilities.

- Some form of Racial Violence would be exerted upon our family/children because they are different and were not raised according to Tongan customs.

> **Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30**
> *Watkins v. INS, 63 F.3d 844 (9th Cir. 1995) (relating to consideration cumulatively of spouse's hardship, fear of persecution, child's inability to master a foreign language, and psychological factors)*

- World Health Report Selected Indicators from the World Health Organization website (Attachment D, URL identified on printout).

I point to this document to reference that Tonga's Overall health system is substantially lower than that of the Industrialized world and the USA (last column of table). In every instance Tonga ranks extremely far behind that of the current health care that the Ostling family receives within the US. The ability to obtain basic health services is severely limited, indeed even the purchase of standard over the counter medicines available within the US cannot be obtained for relief. Additional information is contained within the in process Medical section.

> **Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 393**
> *Matter of Piggott, 15 I&N Dec. 129 (BIA 1974). Husband and wife respondents; natives of Antigua and citizens of the United Kingdom and Colonies; minor United States children; Immigration Judge finding that respondents would not be able to provide for their own necessities in Antigua and that respondents' children*

Bureau of Immigration Affairs    Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

*would suffer because of parents' inability to provide them with*
*proper food, living facilities, and education in that country;*
*youngest United States citizen daughter afflicted with rheumatic*
*fever, under physician's care, and "equal medical care ...not*
*available in Antigua." "Extreme hardship" requirement met.*

In Correa (sited below) the issue of medical hardship was only related to immunizations provided to a young infant and a comparison was not completed regarding other health care issues. Medical information was provided within Mr. Ostling's letter (reference Attachment E) in addition to medical & psychological reports that are in process of being completed and will be forwarded for inclusion within this motion.

**Matter of Stanislaw PILCH & Sofia PILCH (BIA 1996)**
**Interim Decision 3298, pp. 632**
*Finally, the fact that medical facilities in the alien's homeland may*
*not be as good as they are in this country does not establish*
*extreme hardship to the child. Matter of Correa, 19 I&N Dec. 130*
*(BIA 1984).*

- Letter from Mr. Ostling regarding Tonga (reference Attachment E). Within this letter Mr. Ostling voices his opinion of losses and how moving to Tonga impacts the Ostling family. I deeply appreciate Mr. Ostling giving up everything he has to move back to Tonga. I am deeply concerned and saddened that he is giving up everything that he has spent his entire life working for. I truly believe that this will have a significant psychological impact upon him.

**Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999)**
**Interim Decision 3380, pp. 29-30**
*Watkins v. INS, 63 F.3d 844 (9th Cir. 1995) (relating to*
*consideration cumulatively of spouse's hardship, fear of*
*persecution, child's inability to master a foreign language, and*
*psychological factors*

Tonga does not have the sports or other activities that would permit the children to enriched lives, museums, art exhibits, theatre, opera, plays, amusement parks, city/state/government parks, and a vast number of other items. Even the most basic hobbies such as puzzles, car/plane modeling, and arts & crafts to name a few are non-existent. The basics of life that every child enjoys and participates in within the US will not be available to the Ostling children.

Bureau of Immigration Affairs       Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

## Community Ties

Because of the time that I had to complete this motion I was not able to provide submission of a more exhaustive volume of support letters. There were a number of support letters that were submitted directly to the Immigration Judge by friends and family on my behalf. Kindly refer to Attachment I for letters from friends and community.

I have worked in numerous different capacities, some of which have been childcare services at my local church, visitation of the elderly, assistance at school functions, and assistance to family & friends.

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 401**
*Dulane v. INS; 46 F.3d 988, 994-96 (10th Cir. 1995) (failure to consider all factors); Turri v. INS, 997 F.2d 1306 (10th Cir. 1993) (failure to consider substantial involvement and work in the commu-nity); Cerillo-Perez v. INS, 809 F.2d 1419 (9th Cir. 1987)*

**Matter of Catalina ARREGUIN De Rodriguez (BIA 1995) Interim Decision 3247, pp. 4**
*Likewise, we find that the applicant's nearly 20 years of lawful permanent residence in this country constitutes an unusual or outstanding equity. The immigration judge found this not to be so because she "has little to show for her residence in the United States." There is no doubt that additional community ties, property and business holdings, or special service to the community would be equities in her favor. See Matter of Marin, supra. However, the absence of those additional ties in themselves does not negate the weight to be accorded the applicant's long residence in this country, which is otherwise without a criminal record*

**Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 403**
*It is as though these losses, by result-ing in the respondent's having fewer ties here, somehow reduces the sub-stance of his claim. To the contrary, I would view such personal losses as arguably enhancing the hardship to be experienced by an individual forced to sever ties with everything he has known and relied upon since adolescence.*

## Financial

The Ostling family income has always been from Mr. Ostling's employment. He is employed with Daimler Chrysler, within the Chrysler Group and has over eighteen years with the company. The following information is regarding company provided benefits contained within the Total Compensation Package, reference Attachment J.

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

1. Total compensation figures are: Salary = $96,359.07, benefits = $29,646.00, total compensation is $126,005.00 dollars (page 1)

2. 20 Vacation days (page 2)

3. Disability Benefits (page 2),
   - 100% of salary for first 9 months $7,975.00 per month
   - 70% of salary for next 3 months $5,583.00 per month
   - Beyond 1 year, 55% base salary + an additional 10%, $5,184.00 per month

4. Survivor Benefits (page 2), Life Insurance & Death Benefits $574,250, Accidental Benefits $1,270,250.00

5. Dependent Life Insurance (page 3) Spouse $435,000, Children coverage $110,000

6. Retirement Benefits (page 3) $4,340.00 per month

7. Dependent Day Care Account (page 6) this program provides provisions for Mr. Ostling to have special care provided for his parents should the need arise. None of his sisters or his brother has this type of benefit. This benefit provides for substantially savings benefits when caring for elderly parents.

8. Company Cars – Mr. Ostling's position provides for two reduced rate lease vehicles. This package covers all costs for the vehicle except for fuel. This program provides for extreme amounts of savings, especially when children are just beginning to drive.

Mr. Ostling's benefit package that he receives from DaimlerChrysler has been acknowledged as best in class. These would be given up should our family go back to Tonga. Our income in Tonga would not allow our family to afford Life Insurance, or other benefits. Mr. Ostling's Retirement Benefit would be reduced by over 80% (Attachment E). There is also a very extensive health care benefit package that provides for extensive health care coverage, most of which is not available in Tonga. Indeed the impact on him (and directly upon our family) is exception, extreme, and unusual.

> **Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 400**
> *without regard to whether it is unique, circumstances of professional career interruption, poor nutrition and lesser education for children, and family separation. See, e.g., Matter of Iberra, 13 I&N Dec. 277 (R.C. 1968); Matter of Habib, 11 I&N Dec. 464 (D.D. 1965). It is not unreasonable for us to give those*

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

*precedent decisions some weight in the course of our independent interpretation*

### Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 14

*See, e.g., Matter of Gutierrez-Lopez, Interim Decision 3286 (BIA 1996). A respondent's relationship to his spouse's offspring may also be an appropriate consideration in the extreme hardship determination. See Contreras-Buenfil v. INS, supra. Any hardship to a qualifying spouse must always be considered. See Watkins v. INS, 63 F.3d 844 (9th Cir. 1995).*

### Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 385

*When an alien has strongly embraced and deeply immersed himself in the social and cultural life of the United States, however, the emotional and psychological impact of readjustment must be considered in assessing hardship. Santana-Figueroa v. INS, 644 F.2d 1354, 1357 (9th Cir. 1981) (finding that extreme hardship could result from "the combined effect of depriving the petitioner of his livelihood and uprooting him from a community to which he had belonged and contributed for more than a decade.")*

### Matter of Luis Felipe CERVANTES-Gonzalez (BIA 1999) Interim Decision 3380, pp. 29-30

*Watkins v. INS, 63 F.3d 844 (9th Cir. 1995) (relating to consideration cumulatively of spouse's hardship, fear of persecution, child's inability to master a foreign language, and psychological factors*

Mr. Ostling's letter, reference Attachment E, identifies that our family has less than $1,000.00 in our savings account and that we are currently living on a month to month basis (certified bank statements are provided). We have no other assets of any substantial amount. The cost to purchase tickets for the children and Mr. Ostling to Tonga would be in excess of $5,000.00, reference Attachment K. This would place our family in the financial position where we could not provide for our most basic needs.

### Matter of O-J-O (BIA 1996) Interim Decision 3280, pp. 399

*Matter of W-, 5 I&N Dec. 586 (BIA 1953) (higher standard satisfied by married female with residence of 9 years, five dependent children, and few assets to allow expense of travel abroad to obtain visa) and Matter of S-, 5 I&N Dec. 409 (BIA 1953) (higher standard satisfied by 27-year residence, limited savings, and prospect of severe financial hardship if forced to travel abroad for a visa).*

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

**Educational**

In the matter of Kao and Lin, 23 I&N Dec. 45, pg. 53. (BIA 2001) Interim Decision 3446, the parents were trying to prove their deportation would result in extreme hardship for their children because they would be forced to return to an inadequate education system. However, they were being deported to Taiwan, who scored highest in science than any other country and third in mathematics than any other country.[1]  In contrast, Loleini, Maika, and Victor would be returning to Tonga, where the schools did not even qualify to participate in the testing done by TIMSS (Third International Mathematics and Science Study).  Because of this fact, they would be going from an exceptional education to one that is not even on the charts.  In the Matter of Stanislaw PILCH & Sofia PILCH (BIA 1996) Interim Decision 3298, pp. 632 the judge decided that there was "no evidence that they [the children] would be deprived of educational opportunities if they go to Poland."[2]  However, in the following report, much evidence is given to prove the fact that Loleini, Maika, and Victor would in fact be deprived of educational opportunities. By observing the following,

- Education in Michigan compared to the other United States,
- Education in the United States compared to other countries,
- Education in private schools compared to public schools,
- Use of technology in the United States compared to other countries,
- Purpose and goals of education
- Differences between Tongan and United States education
- Lack of Civics education received in Tonga, and
- Issues faced when trying to integrate back into American society

I will prove that this move would qualify as extreme and unusual hardship to the children if the family had to move to Tonga.  The information presented within the education section was based upon government-conducted studies and carry merit. The data was collected from the site reference below, however each referenced publication will be identified individually.

**23 I&N Dec. 45 (BIA 2001) Interim Decision 3446, pp 53 footnote**
Page 53 Footnote 1.*These figures are taken from the Statistical Analysis Report, which is located at the online website for the National Center for Education Statistics at <www.nces.ed.gov/pubs2001/2001028.pdf>. Given*

---

[1] 23 I&N Dec. 45, pg. 53. (BIA 2001).  Interim Decision 3446.
[2] Matter of Pilch, (BIA 1996) Interim Decision 3298., pp. 632

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

*that this study was compiled under the auspices of the United States*
*Department of Education, I find that it holds a significant amount of*
*weight and credibility.*

**Education in Michigan compared to the other United States**

The NAEP, National Assessment of Educational Progress, has been conducting

assessments in Math, Science, Reading, Writing, History, Civics, Geography, and the arts since

1969; these assessments are performed by fourth, eighth, and twelfth grade United States

students. In the tests taken by fourth graders in 2000, only thirteen out of thirty-nine states

scored higher than Michigan. In the tests taken by eighth graders in 2000, only ten out of thirty-

eight states scored higher than Michigan.[3] The NAEP also did a study on which states spent the

most time actually teaching core subjects rather than doing extracurricular activities. Michigan

was among the top 15 states that spent the most time on the core curriculum.[4] Finally, on an

international level, Michigan was only expected to be outscored by ten other countries, while

twenty-nine out of forty states who participated were expected to be outscored by more than ten

countries.[5]

**Education in the United States compared to other countries**

In 1989, the United States government established six National Education Goals in order

to improve the country's quality of education.[6] Because of these goals, the TIMSS and other

studies have been done to compare our education with that of other countries. In Math, the

average of the thirty-eight nations who participated in the TIMSS was 487 while the United

States average was 502. In science, the average of thirty-eight nations was 488 while the United

States average was 515.[7] In 1999, the NCES (National Center for Education Statistics) showed

that not only did United States teachers feel much more confident to teach mathematics and

science than did other countries teachers, it also showed that United States students were actually

---

[3] National Center for Education Statistics: Science Highlights; The Nations Report Card 2000. NCES 2002-452. pg. 1-5. Attachment N
[4] National Center for Education Statistics: Time Spent Teaching Core Academics Subjects in Elementary Schools. NCES 97-293. pg. 18. Attachment O
[5] National Center for Education Statistics: Linking the National Assessment of Educational Progress and the Third International Mathematic and Sciences Study: A technical Report. NCES 98-499. pg. C-1- C-46. Attachment P
[6] National Center for Education Statistics: International Education Indicators: A Time Series Perspective. NCES 97-059. pg. 3. Attachment Q
[7] National Center for Education Statistics: Highlights from the Third International Mathematics and Science Study. NCES 2001-027. pg. 3. Attachment R

Bureau of Immigration Affairs      Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

taught more content in Mathematics and Science than the average of other nations.[8]  The United States has had over 98% enrollment rate for five to thirteen-year-olds since 1985.[9]  The United States also has an average high school completion rate of 90.78%.[10]  The low drop out rate that the United States has held is partly because of the fact that the United States has had the highest Gross Domestic Product of any other country since 1985.  Related to this, it has also been proven that children of low-income families are 5 times more likely to drop out of school.[11]  If the income of the Ostling family drops as a result of the move back to Tonga, the children would be more likely to drop out of school, or fail to continue their higher education (college).

**Education in private schools compared to public schools**

While in the United States, Loleini, Maika, and Victor have attended a private school, Rochester Hills Christian School (RHCS) (Attachment F).  Studies have shown that although public schools spend slightly more time teaching on core curriculum than private schools, it is also shown that private schools not only spend more time in school total, but also spend more time on extracurricular activities than public schools do.[12]  Extracurricular activities done through school are much more productive than time spent on other non-educational or non-physical activities.  In the TIMSS reports, private schools scored 526 in mathematics while public schools only averaged 498.  In science, private schools scored 548 compared to the public school average of 510.[13]  These facts hold true to the children's school reference Attachment F for school records and letter from Mrs. Karen Patton.  In the United States, there is a great opportunity for children to go to private schools if they wish to.  In other countries, especially those as small as Tonga, these opportunities are not as available.

**Use of technology in the United States compared to other countries**

One of the more recent aspects of United States schools is the use of computers in the classroom.  Computers provide an immense database for students to learn even more than they

---

[8] National Center for Education Statistics:  Pursuing Excellence: Comparisons of International Eighth-Grade Mathematics and Science Achievement from a U.S. Perspective, 1995 and 1999. NCES 2001-028.  pg.  48, 53. Attachment S
[9] National Center of Education Statistics: International Education Indicators; A Time Series Perspective.  NCES 97-059.  pg.  36. Attachment Q
[10] National Center for Education Statistics: Drop Out Rates in the United States, 2000. NCES 2002-114.  pg. 41-42. Attachment T
[11] Ibid. pg.  5. Attachment T
[12] National Center for Education Statistics: Time Spent Teaching Core Academic Subjects in Elementary Schools. NCES 97-293.  pg. 8.  Attachment O
[13] National Center for Education Statistics: Pursuing Excellence. NCES 2001-028.  pg. 30.  Attachment S

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

do in the classroom.  In addition to what they learn in the classroom and from their textbooks, students can learn so much more from all of the information that is available to them on the Internet.  In 1983, United States schools had an average of one computer for every twelve students; by 1999, the ratio was one computer to every six students.  Also in 1999, it was shown that 95% of United States schools were connected to the Internet.[14]  In a report done by the NCES in 1997, twelfth grade science students who reported using a computer in their studies had a higher average than those who said they had not used a computer.  Even if the schools do not give the students ample access to computers, 80% of United States students reported that they have a computer in their home.  While 59% said that they had access to the internet at home, 76% of students reported having internet access in their schools and 81% of students reported having access to the internet somewhere, such as a public library.  In 1999, only 5% of international students reported using the Internet for mathematics while 12% of United States students reported using the Internet.  In that same study, 21% of United States students reported using the Internet in science to gain further understanding, while only 8% of international students reported using the Internet.[15]  From this information, it is reasonable to derive the conclusion that one of the reasons that United States students scored so high on the science tests is because of the knowledge they have earned from their use of computers.  Because students in the United States are so accustomed to using the Internet in their schooling, not having access to the Internet would be very detrimental to their education.  By moving to Tonga, Loleini, Maika, and Victor would have no access to the Internet in school.  Computers outside school (and realistically only on the main island of Tongatapu), while they do exist, are very expensive, slow, and are usually not available to commoners.[16]

**The purpose and goals of education**

Although there are many purposes and goals of education, one of the more important ones is to prepare young people to live and function properly in society.  In the United States, students are educated to live in and taught about American society and government.  Other countries teach their children about their specific government and society.  If Loleini, Maika, and Victor must receive their education in Tonga, they will be taught and prepared for Tongan

---

[14] National Center for Education Statistics: Monitoring School Quality: An Indicators Report.  NCES 2001-030R. pg. 28-29. Attachment U
[15] National Center for Education Statistics: Pursuing Excellence. NCES 2001-028. pg. 58-59. Attachment S

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

society, not American society. In Tonga, the goal of education is to provide a balanced education to produce productive members of Tongan society, and to "develop Tonga's human resources to meet the country's manpower needs to achieve continuous national development and growth".[17] Therefore, being educated in Tonga rather than the United States would prove detrimental to Loleini, Maika, and Victor's integration into American society.

**Differences between Tongan and United States Education**

Not only will they be taught to live in Tongan society, there are also other differences that greatly impact Loleini, Maika, and Victor. During their education in Tonga, they would be taught in Tongan rather than English, and none of them speak Tongan. It is reasonable to conclude that if they do not know the language that the classes are taught in, they will not do as well as the other children in their classes. A parallelism I would present is that of the SER Child Development Center in Dallas, Texas, is a program whose mission is to "provide bilingual, literacy-focused child development programs that guide and prepare children toward success in primary and secondary education." They try to teach the Latino children English at the youngest age possible so that they will be ready and successful for their primary schooling. In Loleini, Maika, and Victor's case, however, they are already past the age when this type of program usually takes place and therefore possibilities for success in school are minimal.[18] It would therefore be very difficult for them to be successful in their schooling if it takes place in Tonga. Another difference in Tongan education is the lack of opportunity for further education.

> **Matter of L-O-G (BIA 1996) Interim Decision 3281, pp. 9:**
> *The employment prospects for the adult respondent and the opportunities for further education for the minor respondent and her United States citizen brother will not simply be less in Nicaragua: their opportunities will be vastly diminished if they are returned to one of the poorest countries in the Western Hemisphere.[19]*

In this case, one key element to meeting the extreme hardship requirement was the diminishing of educational opportunities for the children. Similarly, once Loleini, Maika, and Victor are finished with their high school education, they will not be able to go to four-year college in

---

[16] Tongan Government Website. Tonga Communications Corporation. Attachment V
[17] Tongan government website. Ministry of Education. Attachment V
[18] What Works For Latino Youth. White House Initiative on Educational Excellence for Hispanic Americans. pg. 6. Attachment W
[19] Matter of L-O-G (BIA 1996) Interim Decision 3281, pp.9

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

Tonga because there are no four-year colleges there.[20]  Therefore, because they are United States citizens and the closest college to Tonga is in New Zealand, Australia, it is likely they will come back to the United States for their higher education.  This poses many issues because they have been educated in Tonga but will be attending higher education within the United States.

**Lack of Civics education received in Tonga**

Another deprivation resulting from education attained in Tonga rather than the United States is the Loleini, Maika, and Victor will not have received the civics education that students in the United States receive.  Students in the United States learn about:

- How the U.S. government works,
- How our government was founded,
- How we came to the values of our democracy,
- The relationship of the United States to other countries, and
- The roles of citizens in American democracy.[21]

In 1999, the United States scored 106 and 114 in civics knowledge and skills attained, respectively, compared to the international average of 100.[22]  By returning to Tonga for the remainder of their education, when Loleini, Maika, and Victor return to the United States, they would have been deprived of the proper civics education that most children in the United States receive.

**Issues faced when trying to integrate back into American society**

One example of the difficulties faced when integrating back into the United States is the opportunity for Loleini, Maika, and Victor to attain as high quality a job as they would have been able to had their education been solely in the United States.  According to studies done by the NCES on black-white inequality, the unemployment rate for blacks is four to ten points higher than it is for whites.  These studies show that white men earn an average of $2,400 more a year than black men at the same educational level.[23]  If it is this hard for a minority as large as African Americans to keep up with Americans, how much harder would it be for the much smaller

---

[20] Tongan government website.  Attachment V
[21] National Center for Education Statistics: NAEP 1998 Civics Report Card Highlights.  NCES 2000-460. pg. 3. Attachment X
[22] National Center for Education Statistics: Highlights of U.S. Results From the International IEA Civic Education Study.  NCES 2001-107. pg. 3.  Attachment Y
[23] National Center for Education Statistics: Educational Achievement and Black-White Inequality.  NCES 2001-061. pg 14, 18.  Attachment Z

Bureau of Immigration Affairs        Melaia Ostling – A27-106-119
## Motion to Reopen / Reconsider Final Order of Deportation

minority who have been educated in Tonga?  I submit that the condition would be even worse for a person from Tonga than it would be for an African American.

**Education Summary**

According to the evidence provided by the NCES, the education that Loleini, Maika, and Victor receive in a Michigan, private school in the United States is much better than the education they would receive in other countries, especially Tonga.  In addition to the lack of proper education, Tonga does not give them the essential access to technology that they have grown up using and that had helped them so much in the education so far.  The lack of civics education combined with the hardships they would endure attempting to integrate into American business would prove to be very difficult.  Therefore, forcing them to return to Tonga would be an extreme and unusual hardship on the Ostling Family.

## Medical

**Tongan Medical Provisions** – A thorough comparison of essential health care provisions is in process of being completed and will be submitted as a supplement to this report. The following is an excerpt of the medical survey that is in process of being forwarded to Minister of Health in Tonga. The intent is to evaluate the medical facilities and determine the impact that would result from the survey results and identify that this condition is truly different from that of Correa as sited below and deserves additional review.

> **Matter of Stanislaw PILCH & Sofia PILCH (BIA 1996) Interim Decision 3298, pp. 632**
> *Finally, the fact that medical facilities in the alien's homeland may not be as good as they are in this country does not establish extreme hardship to the child. Matter of Correa, 19 I&N Dec. 130 (BIA 1984).*

Medical Facilities Located on the Island of Tonga:

Please check(s) the correct answer(s) in the box provided following the questions.

1.    Does your Island have a Hospital?
        Yes                    No

2.    If Yes, please check what type of Hospital do you have:
        Acute Care                    Joint Commission of Accredited
        Rural Care                        Hospitals
        Tertiary Care                 Trauma Facility
        Other, please explain _____

Bureau of Immigration Affairs          Melaia Ostling – A27-106-119
Motion to Reopen / Reconsider Final Order of Deportation

3.    How many beds does your hospital have?

          0 - 50 beds                    51 - 99 beds

          100 – 150 beds            151 – 200 beds

          Other, please explain _____

4.    What types of services are provided at your hospital?

| | |
|---|---|
| Emergency Medicine | Laboratory Services |
| Diagnostic Imagining | Rehabilitation Services |
| Cardiopulmonary Services | Nutritional Support Services |
| Intensive Care Unit | Cardiac Care Unit |
| Obstretical Unit | Infusion Therapy |
| Pharmacy Services | Transfusion Services |
| Surgical Unit | Medical Unit |
| Pathology Department | Cytology Department |
| Neonatology Department | Gastroenterology |
| Psychiatry Department | Child Psychiatry Department |
| Acupuncture | Adolescent Medicine |
| Anesthesiology Dept | Allergy and Immunology |
| Pediatric Oncology | Oncology |
| Vascular Surgery | Thoracic Surgery |
| Urology | Nuclear Medicine |
| Pediatric Cardiology | Otology, Laryngology, Rhinology |
| Maxillofacial Surgery | Plastic Surgery |
| Occupational Medicine | Ophthalmology |
| Orthopedic Surgery | Oral Surgery |
| Pulmonary Disease | Pediatric Nephrology |
| Proctology | Sports Medicine |
| Rheumatology | Therapeutic Radiology |
| Psychoanalysis | Preventive Medicine |
| Cardiovascular Disease | Child Neurology |
| Colon and Rectal Surgery | Dermatology |
| Diabetes Services | Podiatry Services |
| Endocrinology | Forensic Pathology |
| Family Practice | Medical Genetics |
| Geriatric Services | Hematology |
| Internal Medicine | Head and Neck Surgery |
| Hand Surgery | Infectious Disease |
| Industrial Medicine | Osteopathic Manipulative Medicine |
| Addiction Medicine | Medical Genetics |

          Other, please list _____

5.    Does your Island have an Urgent Care Facility?

          Yes                    No

Bureau of Immigration Affairs      Melaia Ostling – A27-106-119

## Motion to Reopen / Reconsider Final Order of Deportation

6.      If Yes, please check what type of providers who have to deliver care.

        Physician           Nurse Practitioner

        Physician Assistant   Resident/Student in Educational Training

        Other, please specify _____

7.      If Yes, please check the hours of operation.

        8 hours          10 hours

        12 hours        16 hours

        20 hours        24-hour coverage

8.      Does your Island have an Immediate Care Facility?

        Yes             No

9.      If Yes, please check what type of providers who have to deliver care.

        Physician           Nurse Practitioner

        Physician Assistant   Resident/Student in Educational Training

        Other, please specify _____

10.     If Yes, please check the hours of operation.

        8 hours          10 hours

        12 hours        16 hours

        20 hours        24-hour coverage

11.     Does your Island have a Community Health Department?

        Yes             No

12.     If Yes, please check what type of providers who have to deliver care.

        Physician           Nurse Practitioner

        Physician Assistant   Resident/Student in Educational Training

        Other, please specify _____

13.     If Yes, please check the hours of operation.

        8 hours          10 hours

        12 hours        16 hours

        20 hours        24-hour coverage

14.     Does your Island have a School Based Health Facility?

          Yes              No

15.     If Yes, please check what type of providers who have to deliver care.

        Physician           Nurse Practitioner

        Physician Assistant   Resident/Student in Educational Training

        Other, please specify _____

16.     If Yes, please check the hours of operation.

Bureau of Immigration Affairs    Melaia Ostling – A27-106-119

## Motion to Reopen / Reconsider Final Order of Deportation

|  |  |
|---|---|
| 8 hours | 10 hours |
| 12 hours | 16 hours |
| 20 hours | 24 hour coverage |

17.    If your Island does not have any Medical Facilities, then please check the number of miles to the nearest Acute Care Medical facility.

|  |  |
|---|---|
| 0-25 miles | 25-50 miles |
| 50-75 miles | 75-100 miles |
| 100-150 miles | Greater than 150 miles |

19.    Please check the number of hours to the nearest Acute Medical Care facility.

|  |  |
|---|---|
| 0-30 minutes | 30- 60 minutes |
| 1 – 1.5 hours | 1.5 – 3 hours |
| 3 – 4 hours | Greater than 4 hours |

Medical Transportation

19.    Please check the kinds of medical transportation available on your Island.

|  |  |
|---|---|
| Ambulance | Life Flight |
| Coast Guard | Helicopter |
| Air Ambulance | Medical Boat |

Other, please explain _____

Treatment of Medical Conditions

20.    Please check the kinds of treatment you have available for a person on your Island who has Acute Appendicitis.

|  |  |
|---|---|
| Draw Labs | Perform a x-ray |
| Perform Surgery | Transfer person to nearest facility |

Other, please explain _____

**Psychological Exams** - The exams are being scheduled through the Eastwood Clinic on 3950 Rochester Rd. Rochester Hills, MI  (248) 844-6234. These will be provided as a supplement to this motion when completed.

**Individual Medical Exams** – These exams will be provided by Dr. Fermil, for Mr. Ostling, and Dr. Albarracin, for the Children. These doctors' offices are part of the St. John's facility located on Rochester Rd. (248) 844-6000. These will be provided as a supplement to this motion when completed.

Bureau of Immigration Affairs    Melaia Ostling – A27-106-119

Motion to Reopen / Reconsider Final Order of Deportation

An additional concern that will also be reviewed is that of our US regular physical exams. We generally take these for granted and this type of medical service in Tonga is usually not performed (generally not available except possibly on a few of the primary islands). Our family has some of the following performed on a regular basis i.e., pap, pelvic, breast, prostrate, eyes, hearing, lab chemistries, x-rays for diagnostic testing, well child exams, immunizations, dental exams, fluoride treatments, etc. to assure that proper health is maintained. Prior to my incarceration Dr. Fermi was my primary care physician. I am also collecting a report on my physical health condition because I have concerns of my well-being that will directly impact the family should we have to move back to Tonga. This will be submitted upon conclusion.

Correspondence can be provided to the following:

State of Connecticut, Department of Correction
Melaia Ostling # 0294361
York Correctional Institution
201 West Main Street
Niantic, CT 06357

Or to my family, at the following:

Melaia Ostling
PO Box 215174
Auburn Hills, MI 48321

Respectfully submitted,

Melaia Ostling